**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMY KESSLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21-cv-03852 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ARCHIE GROSS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In July 2019, Plaintiff Amy Kessler was driving her car on Interstate 90 when she was rear-ended by a semitruck owned by Defendant McFarland Truck Lines, Inc. ("McFarland") that, at the time, was being operated by Defendant Archie Gross within the scope of his employment with McFarland. As a result of the injuries she sustained in the collision, Kessler has sued Gross and McFarland. Her First Amended Complaint ("FAC") asserts claims for negligence against Gross and seeks to hold McFarland vicariously liable for Gross's negligence. In addition, Kessler asserts a claim against McFarland for negligent hiring and retention. Now before the Court are McFarland's motion for judgment on the pleadings as to its vicarious liability for Gross's negligence (Dkt. No. 163), motion for partial summary judgment as to the claim for negligent hiring and retention (Dkt. No. 161), and motion to exclude certain opinions of Kessler's retained expert (Dkt. No. 172). For the reasons that follow, McFarland's motions for judgment on the pleadings and partial summary judgment are denied, and its motion to exclude expert opinions is granted in part and denied in part.

**BACKGROUND**

The following facts are undisputed.

McFarland is a motor carrier subject to the Federal Motor Carrier Safety Regulations ("FMCSRs"). (Pl.'s Resp. to Def. McFarland's Statement of Material Facts ("PRDSF") ¶¶ 3, 7, 32, Dkt. No. 168.) On October 30, 2017, Gross applied for a truck-driving job with McFarland. (Def. McFarland's Resp. to Pl.'s Statement of Additional Facts ("DRPSAF") ¶ 9, Dkt. No. 175.) At the time he applied to drive for McFarland, Gross had over fifteen years of experience as a commercial truck driver. (PRDSF ¶¶ 10, 12.)

In reviewing Gross's application, McFarland confirmed that Gross had a valid Commercial Driver's License ("CDL") and Gross's CDL had never been suspended or revoked. (*Id.* ¶ 13.) Further, McFarland conducted all the inquiries and background checks required by the FMCSRs. (*Id.* ¶¶ 29–32.) McFarland also conducted its own internal qualification check confirming, among other things, that Gross had no serious or disqualifying traffic violations; had no more than four moving violations in the past three years or two in the past year; and had no preventable accidents involving a fatality, bodily injury treated away from the scene, or disabling damage to a motor vehicle within the past three years. (*Id.* ¶ 23.) In connection with that review, McFarland obtained a detailed Pre-Employment Screening Program report of Gross, which is a report that documents a commercial truck driver's roadside inspection data and U.S. Department of Transportation ("DOT") reportable accidents—*i.e.*, accidents that involve a fatality, an injury requiring medical treatment away from the scene of the accident, or disabling damage to a vehicle such that it must be towed away from the scene of the accident. (*Id.* ¶¶ 30, 36); *see also* 49 C.F.R. 390.5 (defining "Accident" for purposes of the FMCSRs). Nothing in that report disqualified Gross from being hired by McFarland, as it revealed that Gross had no crashes with

fatalities or injuries, no out-of-service violations, and a single speeding ticket. (PRDSF ¶ 31; DRPSAF ¶ 10.)

As required by the FMCSRs, McFarland reached out to Gross's former employers about his past safety record. (PRDSF ¶ 34.) Those inquiries uncovered no evidence that Gross had any prior rear-end collisions or DOT reportable accidents. (*Id.* ¶¶ 35–38.) At the same time, an employment history report from one of Gross's former employers revealed that Gross had been involved in two preventable accidents—one that could have been averted but for some action or inaction of the driver—both of which resulted only in property damage. (PRDSF ¶ 40; DRPSAF ¶¶ 11–12; *see also* 49 C.F.R. § 385.3.) That employer ultimately discharged Gross and listed him as only eligible for rehire upon review. (DRPSAF ¶ 11.) Another former employer reported an incident in which a loose plunger on a trailer operated by Gross caused a salad oil leak. (PRDSF ¶ 40.) And in his application, Gross revealed that he had been involved in an additional preventable accident that resulted only in property damage and reported an additional speeding conviction. (PRDSF ¶ 40; DRPSAF ¶ 8.)

After he successfully completed a road test and a drug screen, McFarland determined that Gross was qualified to work as a commercial truck driver and hired him on November 6, 2017. (PRDSF ¶¶ 15, 24, 33; DRPSAF ¶ 7.) Prior to the incident at issue in this case, Gross was involved in no DOT reportable accidents during his employment with McFarland. (PRDSF ¶ 41.) However, Gross's record at McFarland was not spotless. Rather, he was involved in three more preventable accidents that resulted in property damage only, including one in which Gross rear-ended another truck. (PRDSF ¶ 42; DRPSAF ¶¶ 17–19, 21.) None of those accidents resulted in death, personal injury, or disabling damage, and thus they were not DOT reportable. (PRDSF

¶¶ 42–43.) Gross also received a citation for failure to obey a sign or a signal after he passed a scale while driving his semitruck. (PRDSF ¶ 42; DRPSAF ¶ 16.)

The accident giving rise to this action occurred on July 26, 2019. (DRPSAF ¶ 1.) On that date, Gross was driving his semitruck on Interstate 90 in Roscoe Township, Illinois, in the course of his employment with McFarland. (PRDSF ¶¶ 2–3; DRPSAF ¶¶ 1–3.) While navigating a construction zone, McFarland rear-ended a vehicle driven by Amy Kessler. (PRDSF ¶ 3; DRPSAF ¶¶ 1, 4.) Subsequently, McFarland terminated Gross as a driver on account of his collision with Kessler's vehicle. (DRPSAF ¶ 22.)

Claiming that she suffered both personal injury and property damage from the accident, Kessler brought this lawsuit against Gross and McFarland. (PRDSF ¶ 2.) The operative four-count FAC asserts a claim for negligence against Gross (Count I), seeks to hold McFarland liable for Gross's negligence under a *respondeat superior* theory (Count II), asserts a claim for negligent hiring, training, supervision, and retention against McFarland (Count III), and seeks to hold both Defendants liable for property damage resulting from the crash, namely, the injuries sustained by Kessler's show dogs (Count IV). In response to McFarland's motion for partial summary judgment, Kessler withdrew her claims for negligent training and supervision, such that Count III now sets forth only claims for negligent hiring and retention against McFarland.

## DISCUSSION

Presently before the Court are three motions filed by McFarland. First, McFarland seeks judgment on the pleadings as to Count II of the FAC, which seeks to hold McFarland vicariously liable for Gross's alleged negligence. Second, it moves for summary judgment as to Count III's claim for negligent hiring and retention. Finally, McFarland moves to exclude the expert opinions that Kessler offers in opposition to its motion for summary judgment. The Court will begin by addressing the motion for judgment on the pleadings and then will consider the

admissibility of the challenged expert opinions before moving on to McFarland's motion for partial summary judgment.

## I.     Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings after the filing of the complaint and answer. *See* Fed. R. Civ. P. 12(c); *Supreme Landry Serv., LLC v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008). A Rule 12(c) motion is governed by the same standards as a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). Thus, the Court must take all well-pleaded allegations as true and draw all reasonable inferences in the non-moving party's favor. *Id.* "[T]he motion must only be granted when it appears beyond doubt that the opposing party cannot prove any facts that would support [her] claim for relief." *River Vill. W. LLC v. Peoples Gas Light & Coke Co.*, 618 F. Supp. 2d 847, 850 (N.D. Ill. 2008) (internal quotation marks omitted).

According to McFarland, it is entitled to judgment on the pleadings as to the claim in Count II seeking to hold it vicariously liable for Gross's negligence because it is time-barred. Under Illinois law, the applicable statute of limitations for a personal injury action is two years. 735 ILCS 15/13-202. The accident giving rise to this lawsuit occurred on July 26, 2019, and Kessler initiated this action on July 20, 2021, before the two-year limitations period had run. However, McFarland notes that Kessler's original complaint did not attempt to hold McFarland vicariously liable for Gross's purported negligence. And by the time Kessler filed the FAC with a newly asserted claim for vicarious liability, the statute of limitations had long since run.

As McFarland acknowledges, an untimely claim may nonetheless relate back to the timely-filed original complaint under both federal and Illinois law "when it arises out of 'the same transaction or occurrence set up in the original pleading.'" *Phillips v. Ford Motor Co.*, 435

F.3d 785, 788 (7th Cir. 2006) (quoting 735 ILCS 5/2-616(b)). That is unquestionably the case here, as Count II simply seeks to hold McFarland liable under a *respondeat superior* theory for the same negligent acts of its employee, Gross, as pleaded in the timely-filed original complaint. *See Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 751 (7th Cir. 2005) ("An amendment relates back in Illinois when the original complaint 'furnished to the defendant all the information necessary to prepare a defense to the claim subsequently asserted in the amended complaint.'" (quoting *Boatmen's Nat'l Bank of Belleville v. Direct Lines, Inc.*, 656 N.E.2d 1101, 1107 (Ill. 1995))). Nonetheless, McFarland argues that, prior to filing her FAC, Kessler represented to the Court that she sought only to hold McFarland liable for negligent hiring and retention, and expressly disclaimed any intention of also seeking to hold McFarland vicariously liable for Gross's alleged negligence. Thus, McFarland contends, Kessler should be bound by her earlier representations and relation back should be denied as to Count II.

But there is a good reason why Kessler initially denied that she sought to hold McFarland liable under a *respondeat superior* theory. At the time, decisions from the Illinois Appellate Court established that a plaintiff was precluded from pursuing a direct negligence claim against an employer while simultaneously seeking to hold that employer liable under a *respondeat superior* theory. *See Gant v. LU Transp., Inc.*, 770 N.E.2d 1155, 1160 (Ill. App. Ct. 2002) ("[O]nce an employer admits responsibility under *respondeat superior*, a plaintiff may not proceed against the employer on a theory of negligent hiring, negligent retention, or negligent entrustment."). Consistent with Illinois law at the time, Kessler denied that her original complaint asserted any *respondeat superior* claim against McFarland so as not to jeopardize her claim of negligent hiring and retention against it. Yet, during the early stages of this case, the Illinois Supreme Court issued a decision in which it rejected the Appellate Court's rule and held

"that a plaintiff may proceed with both a direct negligence action against an employer and an action under a theory of vicarious liability." *McQueen v. Green*, 202 N.E.3d 268, 280 (Ill. 2002). Shortly thereafter, Kessler moved for and was granted leave to file her FAC asserting both a direct negligence claim and vicarious liability claim against McFarland—notably without opposition from McFarland. (Dkt. Nos. 68, 69.)

Insofar as Kessler's previous disavowals of a vicarious liability claim against McFarland could estop her from arguing that Count II of the FAC relates back to her timely-filed original complaint, it would be inequitable to bind her to those statements given the subsequently change in the law. And because Count II otherwise relates back to the FAC, the Court denies McFarland's partial motion for judgment on the pleadings.

## II.    Admissibility of Certain Opinions of Kessler's Expert

In responding to McFarland's motion for partial summary judgment, Kessler offers several opinions from her trucking expert, Walter Guntharp. McFarland asks the Court to exclude certain of Guntharp's opinions and argues that the Court should not consider those opinions in determining whether Kessler demonstrates a genuine dispute of fact precluding summary judgment.

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "In *Daubert*, the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (internal quotation marks omitted). The district court's gatekeeping function requires the court to engage in a three-step analysis before admitting expert testimony. *Id.* at 779. Specifically, it must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Id.* The proponent of the expert bears the burden of demonstrating by a preponderance of the evidence that the expert's testimony satisfies the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). With its motion to exclude, McFarland challenges those of Guntharp's opinions that fall within the following three categories: accident causation, trucking industry hiring standards, and Gross's driving history. The Court addresses each challenged category in turn.

### A. Accident Causation

Kessler's opposition to McFarland's motion for partial summary judgment introduces several opinions from Guntharp concerning the cause of Gross's collision with Kessler. Broadly, Guntharp opines from his review of dashboard camera video capturing the incident that the accident was caused by Gross's aggressive driving and failure to respond properly to the traffic conflicts produced by the construction zone. McFarland contends that Guntharp's causation opinions must be excluded because he is not qualified as an accident reconstructionist and, even if he were, his causation opinions are not helpful to the trier of fact.

8

Beginning with Guntharp's qualifications, determining whether a witness is qualified to testify as an expert requires a court to "compar[e] the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Caroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Here, the Court is satisfied that Guntharp is qualified to opine on trucking industry safety standards. Over the course of nearly fifty years, Guntharp has worked as a truck driver and a truck-driving instructor, and he has held multiple positions relating to safety in the trucking industry. As such, other district courts have deemed Guntharp qualified to offer opinions on whether a driver "follow[ed] commercial driver standards before or during [an] accident." *Hanan v. Crete Carrier Corp.*, No. 3:19-CV-0149-B, 2020 WL 584370, at *4 (N.D. Tex. Feb. 6, 2020).

Although Guntharp is qualified to provide expert opinions on whether, in the lead up to the accident, Gross was driving in accordance with accepted industry safety standards, it does not follow that Guntharp also has sufficient expertise to opine on what caused Gross to collide with Kessler. *See Head v. Thrash*, No. 1:21-CV-2057-SEG, 2023 WL 3664442, at *10 (N.D. Ga. Mar. 31, 2023) (explaining that, while the proffered expert had "extensive experience in the trucking industry, particularly in the domain of trucking safety," he nonetheless had "no accident reconstruction experience or other training that would render him qualified to opine about what caused the accident at issue"). Notably, multiple courts have barred Guntharp from opining on the cause of a truck accident due to his lack of expertise in accident reconstruction. *E.g.*, *Cleveland Bros. Equip. Co. v. Vorobey*, 655 F. Supp. 3d 305, 321 (M.D. Pa. 2023); *Rios v.*

*Ramage*, No. 2:19-cv-02602-HLT, 2021 WL 2255050, at *3 (D. Kan. June 3, 2021); *Dahlberg v. MCT Transp., LLC*, No. 11cv203 RHS/LFG, 2012 WL 8945006, at *3 (D.N.M. July 20, 2012).

Even aside from Guntharp's lack of expertise in accident reconstruction, the Court does not believe that his opinions on the cause of the accident would be helpful to the jury. In arriving at his conclusion that Gross's unsafe driving was the cause of the crash, Guntharp relied mainly on the dashboard camera video of the accident. That same video will presumably be viewed by the jury. And Kessler will be free to offer Guntharp's testimony about how Gross's actions fell short of driving standards. But whether Gross's substandard driving caused him to rear-end Kessler's vehicle is a question better left solely to the jury. *See Hanan*, 2020 WL 584370, at *3 ("[A]sking an expert witness to opine on the legal cause of an accident is an issue the jury must resolve." (internal quotation marks omitted)). The jury is fully capable of considering the video footage in light of Guntharp's testimony as to the applicable safe truck driving standards and determining causation for itself. *See United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007) ("There is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts."); *see also Hanan*, 2020 WL 584370, at *4 ("Mr. Guntharp concludes many times, using different words, that had [the driver] acted in a safe professional manner, this crash would not have occurred. The Court will ask the jury—not a witness, even one who is an expert—to make such conclusions."). Consequently, the Court excludes Guntharp's causation opinions.

### B.     Trucking Industry Hiring and Retention Standards

To demonstrate that McFarland was negligent in hiring and retaining Gross as a truck driver, Kessler has offered several opinions from Guntharp about hiring standards in the trucking industry. McFarland challenges Guntharp's qualifications to offer these opinions. Further,

McFarland contends that Guntharp's opinions on hiring and retention practices in the trucking industry are unreliable.

As other courts have found, this Court concludes that Guntharp's long experience in the trucking industry qualifies him to testify as to the industry's practices for hiring and retaining truck drivers. *E.g.*, *Cleveland Bros.*, 655 F. Supp. 3d at 321 ("[I]t appears that Guntharp has intimate knowledge of the trucking industry, along with safety standards and practices for commercial trucks. This experience likely qualifies Guntharp to opine as to the relevant standard of care regarding the qualification of commercial truck drivers . . . ."); *Garrett v. Albright*, No. 06-CV-4137-NKL, 2008 WL 697590, at *2 (W.D. Mo. Mar. 11, 2008) ("Guntharp's knowledge and experience . . . qualify him as an expert in trucking industry practices."). That Guntharp has not personally been involved in hiring truck drivers since the 1980s and lacks recent experience working directly for a motor carrier does not render him unqualified. *See Oaks v. Wiley Sanders Truck Lines, Inc.*, No. 07-45-KSF, 2008 WL 4180267, at *3 (E.D. Ky. Sept. 8, 2008) ("Although Mr. Guntharp may have never hired an entry-level driver . . . Mr. Guntharp has long-standing and extensive involvement in the trucking industry that qualifies him to testify in this matter."). Any shortcomings concerning the nature of Guntharp's experience are matters that can be explored by McFarland on cross-examination. *See, e.g.*, *Kucharski v. Orbis Corp.*, No. 11-CV-206-F, 2017 WL 1806581, at *5 (N.D. Ill. May 5, 2017) ("[W]ith respect to Defendant's objection that [the proffered expert's] particular experience is not relevant because he did not work in the shipping industry specifically, Defendant may cross-examine [that expert] regarding the particular circumstances of his experience and present contrary evidence as it sees fit.").

Next, the Court considers the reliability of Guntharp's methodology. To be deemed reliable, it is not enough that an expert be qualified to opine on a particular matter. *Smith*, 215

F.3d at 718. Rather, even with respect to the most well-qualified of experts, a district court must also be satisfied that the expert employed a reliable methodology in reaching his conclusions. *Id.* That assessment "is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013). By contrast, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718. While the reliability inquiry is "flexible," at bottom, it requires ensuring "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999). Accordingly, an expert's "work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). A district court "enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000).

In attacking Guntharp's methodology, McFarland focuses on his claim "that the standard in the trucking industry for hiring and retaining truck drivers is the 'rule of three': reasonably prudent motor carriers do not permit someone to drive a commercial motor vehicle if he has a combination of three or more moving violations and accidents in a three-year period." (DRPSAF ¶ 23.) McFarland contends that Guntharp's assertion that the trucking industry adheres to a "rule of three" in hiring drivers is *ipse dixit* that lacks support from any reliable studies or data. "In an

*ipse dixit* opinion, the expert asserts a 'bottom line' conclusion, but lacks any articulable facts to substantiate that conclusion or completely fails to explain the reasoning or methods employed to reach that conclusion." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *7 (N.D. Ill. Mar. 31, 2017).

The Court disagrees that Guntharp's "rule of three" opinion is unsupported *ipse dixit*. Rather, Guntharp explains that his opinion is based on his years of experience in the trucking industry, as well as his review of the hiring and retention policies of thousands of trucking companies. "[T]hat an expert's conclusions are based only on his observations and extensive specialized experience does not render them inadmissible. This includes opinions regarding generally accepted standards in an industry within the expert's purview." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 824 (N.D. Ill. 2013) (citation omitted); *see also Garrett*, 2008 WL 697590, at *2 ("In the trucking context, an expert may base an opinion on personal experience when the testimony is used to establish an industry standard."). Further bolstering Guntharp's "rule of three" is a 2011 study by the American Transportation Research Institute finding "that there is a significant increase in potential for crashes for a driver that's had two crashes." (DRPSAF ¶ 25.)

Implicitly acknowledging that Guntharp's "rule of three" has some factual foundation, McFarland attacks the quality of the information on which Guntharp's opinion was derived. Specifically, McFarland derides Guntharp for simply locating trucking industry hiring and retention policies through internet searches and notes that the American Transportation Research Institute study is outdated, as it was superseded by a study conducted in 2018. Such criticisms concern the quality of the information on which Guntharp relied rather than his methodology. But it is not for this Court to "unduly scrutinize[] the quality of the expert's data." *Manpower*,

732 F.3d at 806. "The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury . . . ." *Id.* at 808. For purposes of the Court's reliability assessment, it is enough that Guntharp's opinions are informed by his years of experience together with exactly the kind of materials upon which one would expect an expert in trucking industry hiring and retention practices to rely: the individual policies of numerous trucking companies and an industry study. *See Oaks*, 2008 WL 4180267, at *3 ("Mr. Guntharp is within his area of expertise and relied on his review of [the defendant's] policies, common industry practices, and his knowledge of the industry to reach his conclusions, a methodology which is generally accepted in the trucking industry and legal community.").

Finally, McFarland asserts that Guntharp's "rule of three" is undermined by the data on which he relies. It highlights how some of the trucking company policies that Guntharp reviewed do not automatically disqualify a driver whose preceding three-year record includes any combination of three moving violations and accidents but instead consider the seriousness of the accident or violation. However, that Guntharp's "rule" might not be ironclad speaks to the correctness of his conclusions rather than the reliability of his methodology. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt."). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021).

In sum, the Court finds that Guntharp is qualified to opine on driver hiring and retention practices in the trucking industry and employed a reliable terminology in concluding that

trucking companies generally abide by a "rule of three" in considering a prospective driver's history. The Court therefore denies McFarland's motion to exclude Guntharp's opinions on the trucking industry's standards for hiring and retaining drivers.

### C.   Gross's Driving History

The final category of opinions that McFarland seeks to exclude are Guntharp's commentary on Gross's prior accident history. Based on his review of Gross's record of accidents and traffic violations, Guntharp opines that "Gross could not safely operate a commercial motor vehicle because of a lack of caution and attention while driving" and "routinely operated his truck in an aggressive manner that jeopardized the safety of others." (DRPSAF ¶¶ 34, 38.) Kessler makes no effort to defend these opinions. And the Court agrees that Guntharp's characterization of Gross as an unsafe driver is pure *ipse dixit*. Rather than explain how the circumstances of each individual incident demonstrate Gross's carelessness or aggressiveness, Guntharp seems simply to conclude that because Gross was involved in multiple preventable accidents and received multiple citations, he must have been an inattentive and overly aggressive driver. Those unfounded opinions will be excluded.

### III.   Partial Summary Judgment

McFarland moves for summary judgment on Count III of the FAC, which sets forth a claim for negligent hiring and retention. Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011).

In Illinois, a plaintiff has a cause of action against an employer for negligently hiring or retaining "an employee it knew, or should have known, was unfit for the job so as to create a

danger of harm to third persons." *Van Horne v. Muller*, 705 N.E.2d 898, 904 (Ill. 1998). A claim for negligent hiring and a claim for negligent retention share the same elements. *Id.* Thus, to establish either claim, a plaintiff must prove:

> (1) the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury.

*Id.*

McFarland contends that, prior to his collision with Kessler, it had no reason to believe that Gross was an unsafe driver. First, it notes that, at the time of his hire and throughout his employment with McFarland, Gross had a valid CDL, his CDL had never been suspended or revoked, and he met each of the FMCSRs' qualifications for commercial drivers. And McFarland asserts that it was entitled to rely on the fact that Gross was qualified under the FMCSRs.

Yet that Gross was, at all relevant times, qualified to drive under the FMCSRs does not mean that McFarland could not have been negligent in hiring or retaining him as a driver. The FMCSRs explicitly state that they "establish ***minimum*** duties of motor carriers with respect to the qualifications of their drivers." 49 C.F.R. § 391.1(a) (emphasis added). Indeed, that McFarland conducts its own internal driver qualification check, which it describes as more stringent than what the FMCSRs require (PRDSF ¶¶ 22–23; Def.'s Opp'n at 5), suggests McFarland's awareness that a driver who is qualified under the FMCSRs might nonetheless prove unfit for employment. Kessler has also introduced the testimony of Guntharp showing that the truck industry generally employs a stricter standard in hiring and retaining drivers than the minimum requirements of the FMCSRs. (DRPSAF ¶¶ 23–24); *see Garrett v. Albright*, No. 06-CV-4137-NKL, 2008 WL 795621, at *3 (W.D. Mo. Mar. 21, 2008) ("Plaintiffs have established

16

that even if [the motor carrier] complied with the FMCSR, failure to follow industry practices caused [the motor carrier] to negligently hire an unsafe driver.").

Next, McFarland argues that Gross's driving history prior to the accident at issue here consisted only of non-DOT reportable incidents and minor traffic citations, none of which sufficed to put McFarland on notice that hiring and retaining Gross as a truck driver would present a risk to the physical safety of other drivers. The Court finds the evidence of Gross's driving and employment history sufficient to create a dispute of fact as to whether McFarland knew or should have known that Gross was an unsafe driver. With respect to the negligent hiring claim, McFarland knew when it hired Gross that, in the preceding three years, Gross had been involved in three preventable accidents and had received two speeding citations. (PRDSF ¶ 40; DRPSAF ¶¶ 8, 10.) While none of the accidents were DOT reportable, a reasonable jury might nonetheless find that they should have alerted McFarland that Gross was an unsafe driver. *See Collins v. GKD Mgmt., LP*, 697 F. Supp. 3d 1308, 1326 (N.D. Ga. 2023) ("The relevant question is not whether [the motor carrier] believed that [its employee] was a competent driver, but whether a jury could find [the motor carrier] negligent based upon certain proclivities known by [the motor carrier] about [its employee] before the accident in this case occurred."); *cf. Cassara v. DAC Servs., Inc.*, 276 F.3d 1210, 1225 (10th Cir. 2002) ("[T]he motor carrier industry's needs and concerns involving drivers extend to a range of past accidents, incidents, mishaps, occurrences and events well beyond those [that are DOT reportable]."). Given that Gross was involved in three accidents and received two speeding tickets over a short period of time, a jury could reasonably conclude that McFarland should have viewed Gross as posing an unacceptable risk to the safety of other drivers. *See Onofre v. C.R. England, Inc.*, No. SA-15-CV-425-DAE, 2016 WL 3406196, at *5 (W.D. Tex. June 17, 2016) ("While these accidents . . . were allegedly

not reportable to the [DOT], and were unquestionably minor . . . their frequency could indicate that [the employee's] retention as a truck driver created an unreasonable risk of harm to other drivers on the road. This is a question of fact for the jury.").

Bolstering the existence of a question of fact concerning whether McFarland should have known of the risks of hiring Gross as a driver is Guntharp's testimony regarding trucking industry standards. Even if the average trucking company would not automatically disqualify a driver with a combination of three accidents or moving violations over a three-year period, Guntharp's testimony suggests that a driver with such a record should at least raise a red flag for a motor carrier. Moreover, a jury might find evidence concerning Gross's prior employment history relevant to the inquiry. Although there is some dispute regarding the voluntariness of Gross's previous discharges, viewed in the light most favorable to Kessler, the evidence shows that three of Gross's four employers preceding McFarland fired him. (DRPSAF ¶¶ 8–11, 13–14.) View as a whole, the Court finds that the record demonstrates an issue of fact for the jury as to whether McFarland knew or should have known that Gross was an unfit driver when it hired him. Then, over the approximately twenty months between when he began working for McFarland and his collision with Kessler, Gross accumulated an additional traffic citation and was involved in three more preventable accidents. (PRDSF ¶ 42; DRPSAF ¶¶ 16–19.) Thus, his record during his employment with McFarland likewise creates an issue of fact as to whether McFarland knew or should have known it was retaining an unfit driver.

Finally, to the extent that Gross's driving history should have alerted McFarland to his unfitness, McFarland contends that the evidence fails to show that Gross's particular unfitness as a driver proximately caused Kessler's injury. Proximate cause incorporates "two distinct requirements: cause in fact and legal cause." *Abrams v. City of Chicago*, 811 N.E.2d 670, 674

(Ill. 2004) (internal quotation marks omitted). "A defendant's conduct is a 'cause in fact' of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury." *Id.* at 675. That will be the case where, "absent [the defendant's] conduct, the injury would not have occurred." *Id.* On the other hand, "legal cause" entails an assessment of foreseeability. *Id.* (internal quotation marks omitted). In the negligent hiring and retention context, the foreseeability inquiry looks to whether the "particular unfitness of the employee . . . rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Van Horne*, 705 N.E.2d at 906. There is no question that McFarland's hiring of Gross was a but-for cause in fact of Kessler's injuries. *Abrams v. FedEx Ground Package Sys., Inc.*, 585 F. Supp. 3d 1131, 1143 (S.D. Ill. 2022) ("Under the 'but-for' test, a defendant's conduct is a cause in fact of the injury if it would not have occurred absent defendant's conduct."). However, McFarland argues that it could not have reasonably foreseen from Gross's previous property-damage-only accidents that Gross would be involved in an accident of the kind here—a rear-end collision causing personal injury.

As an initial matter, McFarland takes an overly narrow view of the foreseeability inquiry. As McFarland sees it, because Gross's driving record contains no incidents where he caused personal injury and a single incident where he rear-ended another commercial vehicle, McFarland could not have reasonably foreseen that Gross would rear-end a non-commercial vehicle like he did here. But proving foreseeability in this context does not require "that a defendant must have foreseen the precise nature of the harm or the exact manner of occurrence; it is sufficient if, at the time of the defendant's action or inaction, some harm could have been reasonably foreseen." *Anicich v. Home Depot USA, Inc.*, 852 F.3d 643, 654 (7th Cir. 2017) (quoting *Regions Bank v. Joyce Meyer Ministries, Inc.*, 15 N.E.3d 545, 552 (Ill. App. Ct. 2014)).

"Illinois courts can and have applied that rule to find foreseeable harms disproportionate to more predictable harms." *Id.*

The question for the Court is whether a reasonable jury could conclude that McFarland should have foreseen that a driver with Gross's record would be involved in a vehicular collision. The Court believes that the answer is yes. While Gross had never been in an accident as serious as his collision with Kessler, a jury could reasonably find that his overall record was reflective of an inattentive and aggressive driver who was simply lucky to have not been involved in a more serious accident. *See Carmona v. 4-Bros. Transp. LLC*, 731 F. Supp. 3d 1046, 1051 (N.D. Ill. 2024) (finding that the plaintiff had alleged "a sufficient nexus between [a truck driver's] prior violations, which involve driving errors that could contribute to accidents, and the collision" underlying the lawsuit). To that point, the jury will hear Guntharp discuss the trucking industry study finding "that there is a significant increase in potential for crashes for a driver that's had two crashes and that drivers with multiple tickets or multiple accidents have a significantly greater propensity for future crashes." (DRPSAF ¶ 25.) Especially since, "foreseeability is ordinarily a question of fact for a jury to decide," *Anicich*, 852 F.3d at 654, the Court believes that it is for the jury to decide from Gross's overall record, Guntharp's testimony, and the other evidence whether Gross's particular unfitness as a driver was a reasonably foreseeable cause of Kessler's injuries.

In sum, the Court finds that Kessler has come forward with sufficient evidence to create genuine disputes of fact as to whether McFarland knew or should have known that Gross was an unsafe driver and whether that particular unfitness proximately caused his collision with Kessler. Consequently, the Court denies McFarland summary judgment as to Count III's claim for negligent hiring and retention.

## CONCLUSION

For the foregoing reasons, McFarland's motions for judgment on the pleadings (Dkt. No. 163) and for partial summary judgment (Dkt. No. 161) are denied, and its motion to exclude certain opinions of Guntharp (Dkt. No. 172) is granted in part and denied in part.

ENTERED:

Dated:  September 26, 2025

_____
Andrea R. Wood
United States District Judge